## In re FRANKFORT.

### (District Court, E. D. New York, July 22, 1905.)

BANKRUPTCY—CONCEALMENT OF ASSETS—ORDER TO SURRENDER.

An order may be made requiring a bankrupt to turn over to his trustees money admitted to have been in his possession a few days before his bankruptcy, notwithstanding uncontradicted testimony produced by him as to the loss of the money, where such testimony is not credible.

In Bankruptcy. On report of special commissioners on application for order requiring bankrupt to turn over assets.

The following is the report of Robert F. Tilney, Special Commissioner:

"This matter was referred to me as special commissioner upon the return of an order to show cause why the bankrupt should not turn over to the trustee certain property, or the proceeds of the same, alleged to have been concealed by him. Prior to April 24, 1905, at which date the order of adjudication in bankruptcy was made, Max Frankfort, the bankrupt, was engaged in business as a dealer in butter and eggs and groceries at No. 139 Sands street, in the city of Brooklyn. His schedules showed an indebtedness of between $10,000 and $11,000; the great majority of which indebtedness was incurred for merchandise purchased from about the 1st of April. The trustee, on taking possession, found a stock of goods appraised at something like $200, and this was all the bankrupt had to show as the result of his dealings during the month of April.

He accounts for some four thousand and odd dollars by the introduction of returned checks showing payments to various creditors aggregating that amount. He accounts for the balance of the amount which he should have on hand in the following way: He testified that on the 19th of April he had in his possession $4,000 in bills and $2,039.10 in checks of customers. This money and these checks he put into a satchel, which, as both he and his wife testified, was large enough to carry lunch for five or six people, and had been used for that purpose, and he told his wife to take this money and checks to the Borough Bank of Brooklyn where he had an account, and to have the checks certified at the various banks on which they were drawn, and to have the bills changed to ones of larger denominations. The reason why, as he testified, he wished to have this done, instead of depositing this in the Borough Bank, was that he was going to change his account to the Kings County Bank and that he wanted certified checks so that a deposit could be made as if it was cash, and as he didn't propose to change his account for several days, he wanted the bills of larger denomination so that they would not occupy so much space in his safe.

We are met at the outset of this story with, it seems to me, a very insufficient reason for its existence. Mrs. Frankfort testified that she took the satchel containing the money and the checks and went to the various banks to have the checks certified or cashed, and was unable, on account of her not being known at those banks, to accomplish this object. She then went to the Borough Bank and there the cashier told her that she could deposit the checks and then draw a check against the amount of the deposited checks which the bank would honor and pay to her in cash. To get the check she had to go back to the store, and so, with the satchel and the money, she went back to the store, had her husband sign the check, and then she came back again to the Borough Bank, presented the check, and the money, two thousand and odd dollars, was paid to her in cash which she put into this satchel, together with the $4,000 already in it. She further testifies that she went to several banks in the neighborhood and changed some of this money so that she had 21 $100 bills and the rest of the $6,000 in smaller bills, with the ex-

144 F.—46

ception of about $50.10 in silver. She then started back to the store, but, as she says, thought that she would go down Fulton street and look in at the shop windows and see the bargains, and that this shopping excursion lasted from a half an hour to an hour. She said she carried the satchel lightly in her left hand, and that it was quite heavy to carry. Having carried it along Fulton street, and' looked at the bargains and the shop windows she then made up her mind that she would go home, and coming to the corner of Smith and Fulton streets, where she was to take the car, she looked down to open the bag to get 10 cents for her car fare when she found that she had only the handle of the satchel in her hand, and that the body of it was gone.

She says that some time before, when she was looking in at Matthews' window on Fulton street, she had felt the satchel lighter, but that she did not look down to see the reason for this, and, in fact, she hadn't looked down at the bag from the time she left the Borough Bank until, wishing to open it, she found that it was gone; that she had not felt anyone grab it, or attempt to take it away from her; and that, in fact, nothing unusual had occurred while she was on her shopping expedition, so far as the bag was concerned; that then, without making any outcry, without retracing her steps, without notifying the police, she threw the handle into the street and walked home weeping. When she arrived at home she told her husband that she had lost the money, but she didn't tell him how, the circumstances of it, and he didn't ask her. He told her not to say anything about it, not to tell anybody anything about it; and she even testified that her brother-in-law, David Frankfort, who was in the employ of her husband, didn't know anything about the loss until he heard the story of it as she told it in court. She also testified that after she came home and told her husband of this loss that he sent her again to the Borough Bank for the purpose of withdrawing one of the checks which had been deposited, and that even then she did not tell any one at the Borough Bank that she had lost this $6,000.

The bankrupt says that he didn't tell anybody of this loss; that he didn't notify the police; that he didn't advertise for it; in fact, that he made no effort whatsoever to recover the money. That he went over that afternoon to the market in New York, and saw some parties with whom he was in the habit of dealing, but that he said nothing to them about this loss. I think the story of both the bankrupt and his wife is false, and that the money was not lost as they say it was. It is beyond belief that this woman should have lost the money as she said she did; that she could have walked the street holding the handle only for so long a time, and not have missed it; and it seems to me that this was a bald conspiracy, hatched up between the husband and wife to defraud the creditors of this amount of money.

Although the story of both the bankrupt and his wife is uncontradicted we are not, under the decisions of cases of this kind, bound to believe it; and in fact the cases hold that where money or property is lost under circumstances which are not to be credited, the bankrupt must refund the same. It is urged by the attorney for the bankrupt that in the reported cases of extraordinary losses of this kind that the losses have always come when the money or property was in the physical possession of the bankrupt himself, but this case differs in that the money was lost by the bankrupt's wife. To my mind this only, so far as the bankrupt is concerned, adds to his guilt, in that he is not man enough to face the responsibility, but foists the loss off on the woman.

The bankrupt further testified that when he put this $4,000 in the satchel on the morning of the 19th he also had about $400 in cash in his possession. It has been shown further he had purchased, and there were delivered to him on the evening of the 18th and the morning of the 19th, 286 cases of eggs, of which he had on that morning, before his wife went with this money to the bank, sold some 10 or 15 cases, leaving the value of about 275 cases of eggs, amounting to $1,520, to be accounted for. On the following Sunday, the bankrupt left his home and went away. He was gone for almost a week, his whereabouts not being known by his wife. She conducted the business and sold goods, but it is evident that this $1,520 worth of goods had been disposed of before the husband left.

It seems to me, then, that the bankrupt has concealed and is concealing property from the trustee, and that he should turn over to him the sum of $7,959.10, made up as follows:

| | |
|---|---|
| Cash alleged to have been lost by his wife | $6,039 10 |
| Cash on hand April 19th | 400 00 |
| Proceeds of 275 cases of eggs | 1,520 00 |
| | 7,959 10 |

Lesser Brothers (William Lesser, of counsel), for the trustee.
J. Leon Brandmarker (Morris Cukor, of counsel), for the bankrupt.

THOMAS, District Judge. The finding of the special commissioner that the evidence of the bankrupt and his wife as to the loss of the bills was false, is fully approved. As to the items of $400 and $1,520, there is room for reasonable doubt. The bankrupt is given the benefit of it, and the special commissioner's finding will be modified so as to direct the payment of $6,039.10.